RODGARD CORPORATION and Estate
of Mason C. Winfield, Plaintiffs,

v.

MINER ENTERPRISES, INC. and David
G. Anderson, Defendants.

No. 84–CV–0397E(M).

United States District Court,
W.D. New York.

Dec. 29, 1995.

Jeremiah J. McCarthy, Phillips, Lytle, Hitchock, Blaine & Huber, Buffalo, NY, for Plaintiff.

Dorsey L. Baker, Lubbock, TX, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

ELFVIN, District Judge.

Plaintiffs Rodgard Corporation ("Rodgard") and its erstwhile employee Winfield brought this action requesting either that United States Patent No. 4,198,037 ("The Patent") be corrected as a result of the defendants' failure to comply with the joint-inventorship provisions of 35 U.S.C. § 116 or that a certificate issue declaring Winfield—who died December 16, 1992—to have been a joint inventor pursuant to 35 U.S.C. § 256 or that The Patent be declared invalid due to the defendant Anderson's intentional failure to name Winfield as a joint inventor pursuant to section 256. Fraud, misappropriation of a trade secret, breaches of fiduciary duties and of contract terms and unjust enrichment are also alleged. The defendants counterclaim that the plaintiffs breached the contract.

This Court has authority to decide the patent questions pursuant to 28 U.S.C. §§ 1338 & 2201; jurisdiction to resolve the contract and remaining related disputes is provided by 28 U.S.C. §§ 1332(a) & 1367(a). A bench trial was conducted in 1992 after which this Court permitted the plaintiffs to serve and file an Amended Complaint to conform the pleading to the evidence which had been presented. Following a re-opening of discovery and further testimony taken in

September of 1993, the parties submitted proposed findings of facts and conclusions of law and oral arguments were had. The following are this Court's Findings of Facts and Conclusions of Law and Order.

The Patent, issued to defendant Anderson and assigned to defendant Miner Enterprises, Inc. ("Miner"), describes a method of using a copolymer polyester elastomer to make compression springs and certain resulting products utilizing such. (A material registered under the trade name of "Hytrel" was the only copolymer polyester elastomer specifically addressed during this litigation.) A compression spring itself is covered in The Patent's Claims 1–5 which describe methods by which Hytrel is annealed and compressed to form a compression spring pad produced thereby.[1] A typical spring as presented in this litigation is a solid device shaped like a large hockey puck—or a holeless doughnut—, approximately four and one-half to five and one-half inches in diameter and one to several inches in height or thickness. Each of the two faces of such spring is attached to a relatively thin circular metal plate which is approximately six and one-half inches in diameter. Each plate has several holes located on or along equiangular radii, each hole having associated therewith protrusions extending a fraction of an inch perpendicularly from one face of the plate. The spring is mechanically bonded to the two plates. In simplified terms, the mechanical bond is achieved by pressing a plate onto each face of the spring with the protrusions facing into the spring with such force that they penetrate the spring and act as claws in grabbing the Hytrel. Further bonding strength is achieved by so increasing the pressure as to force the Hytrel through the holes (which have been made in and through each plate in the process of producing the protrusions) to the point that it extends and expands beyond the opposite or outer face of the plate, such so-extruded material thereafter assuming shapes like partial domes or mushrooms which further act to lock the plates in place. Such plates and bonding methods are also part of The Patent and of this dispute. The spring together with the attached metal plates form a compression spring unit and are covered by Claims 6–11 and 14–15 of The Patent.[2] Such compression spring units may be stacked together to form part of a shock-absorbing mechanism in railroad-car draft gears—devices which absorb the energy which results from the impact between two railroad cars as they are being transported or coupled. The plaintiffs allege that Winfield provided a significant quantum of the crucial information for the patented method and participated in the conception of the springs, plates and combination units and therefore that The Patent should be corrected by adding Winfield as a named co-inventor pursuant to 35 U.S.C. § 256 or that The Patent should be declared invalid if the defendants are found to have, with deceptive intent, omitted naming Winfield as a co-inventor. Alternatively, the plaintiffs assert that the defendants do not adequately dis-

---

1. Claim 1 is the most general, claiming a method by which Hytrel is annealed and then compressed in an axial direction to at least fifty percent of its original axial length in the direction of the compressive force to form a compression spring; Claim 2 limits Claim 1 by further specifying that the compressive force is to be applied to the entire face of the spring; Claim 3 claims the product produced by the method in Claim 1; Claim 4 specifies a minimum annealing time of fifty hours; Claim 5 claims the product produced by the method in Claim 4.

2. Claim 6 describes a method of making a compression spring unit by forming a pair of plates with incongruities on one face, placing one plate with such incongruities against each side of the compression spring, and applying a force sufficient to cause the Hytrel to flow about the incongruities to form a mechanical bond between the plates and the spring; Claim 7 describes the unit

produced by the method of Claim 6; Claim 8 specifies a particular force to be applied in the method of Claim 6; Claim 9 specifies that the incongruities would include apertures in the plates; Claim 10 specifies that incongruities would include projections extending outward from one face of the plate; Claim 11 indicates that the faces of the plates may be "roughened" before their assembly into units; Claims 14 and 15 are combinations of earlier claims, specifying a method whereby many of the previous methods described in The Patent can be combined into one step resulting in a product. Claims 12 and 13 involve a multi-tiered compression spring assembly that makes use of the Hytrel spring described in Claims 1–5 and at issue in this action, but which assembly is not a part of this litigation; therefore Claims 12 and 13 are not relevant for the purposes of this litigation and its outcome.

close in The Patent the best mode of mechanically bonding the Hytrel springs to metal plates thereby violating 35 U.S.C. § 112 and that The Patent therefore should be declared invalid. The plaintiffs also claim that the defendants breached the terms of the parties' agreements—the first entered into in 1976 and signed by Anderson for Miner and by Winfield for Rodgard and the second entered into in 1977 and executed by Miner's president for Miner and signed by Winfield individually and on behalf of Rodgard—, that such agreements together with the parties' course of dealing and performance of the agreements created a confidential relationship which in turn imposed enhanced duties upon the defendants which enhanced duties were breached, that the defendants' conduct during the course of the parties' relationship was fraudulent in that they misappropriated or inappropriately divulged the plaintiffs' trade secrets, that as a result of such conduct the defendants were unjustly enriched and that the breaches entitle the plaintiffs to various alternative remedies ranging from compensatory and punitive damages to the imposition of a constructive trust over the proceeds held by Miner from the sales of the patented product. The defendants counterclaim that the plaintiffs breached the contract. Both sides seek attorney's fees.

Rodgard is a corporation duly organized under the laws of New York; its principal place of business is and at all times relevant hereto has been Buffalo, N.Y.[3] Miner is a corporation duly organized under the laws of Delaware with its principal place of business in Illinois. Anderson was at all times relevant to this case an officer and employee of Miner and a resident of Indiana; Winfield was at all such times an employee of Rodgard.

During the spring of 1976 Anderson, in the course of Miner's business, was experimenting with using Hytrel in compression spring units for spring-type draft gears. Joint Exhibit ("JX") 3. In May of 1976, E.I. DuPont de Nemours & Co. ("Dupont") (the bulk distributor of Hytrel) identified Winfield to Anderson as a person skilled in the use of Hytrel and recommended Rodgard as a potential commercial supplier of the fabricated springs to Miner. JX 2, Transcript page ("TR") 52. A July 12, 1976 meeting between Anderson and Winfield resulted in a "Protocol" prepared by Anderson and signed by him and by Winfield.[4] Such document refers to the "Miner–Rodgard development and relationship regarding 'Hytrel'", describes some of Rodgard's general manufacturing capabilities and specific experience with Hytrel and provides several paragraphs which outline a contract calling for Rodgard to set up a "melt-cast" system within its facility to fabricate Hytrel springs which would be bonded to plates furnished by Miner in exchange for which Miner would pay direct costs including those for tooling and material. The Protocol also indicates that, in consideration for Rodgard's disclosure of its manufacturing techniques, Rodgard would be given preferential (but non-exclusive) consideration to supply Miner's future domestic production needs and that such "information [would] not be used domestically to the detriment of Rodgard." Although Anderson clearly hedged at trial when he was asked whether such agreement was intended to mean that Rodgard's techniques were to be kept confidential, he unhesitatingly indicated that it did not give him the right to publish Rodgard's techniques in a patent.[5] In an internal memo, Anderson discussed the fact that Rodgard was

> "well ahead of the industry in fabrication technique (this was confirmed by DuPont). Their costs and process control are substantially better than alternative processes. Rodgard is the only known firm in the world using this low cost system * * *. I suggest that all concerned maintain extreme confidence regarding this association and development as their techniques

---

3. Rodgard was formed in late 1981 for the purpose of acquiring the assets of Rodgard Mfg. Corporation, a Delaware corporation whose principal place of business was Buffalo. The Estate of Mason C. Winfield is the successor in interest to the rights of Winfield.

4. JX 4; Anderson signed on behalf of Miner and Winfield on behalf of Rodgard.

5. TR 78–79.

could easily be copied." Plaintiffs' Exhibit ("PX") 31.

Shortly after their July meeting, Anderson and Winfield began to work closely together.[6] One of the problems Anderson had encountered during his work with Hytrel was the presence of "voids" in the Hytrel springs.[7] Anderson testified that, early in their association, Winfield had disclosed to him that voids in the Hytrel could be eliminated by a method of applying external pressure to it during its cooling.[8] Anderson incorporated this method of eliminating voids into the abstract of the disclosure section of his patent application. Such also comprised the subject matter of Claims 4, 5 and 6 in his application which he began to prepare as early as November 1976 (Defendants' Exhibit ("DX") 37)[9] and which was filed in December 1976 and showed Miner as the assignee.[10]

During the several months immediately following their agreement, unsuccessful attempts were made to chemically bond Hytrel pads to metal plates.[11] The prospect of mechanically bonding the Hytrel springs to metal plates began to be seriously considered in approximately August, and the effort and time spent on such prospect thereafter increased. The evidence resolving the question who came up with the idea to mechanically (as opposed to chemically) bond the metal plates to the Hytrel material is completely conflicting.[12] However, there is no documentary corroboration and little credible independent testimonial corroboration of Winfield's claim of co-inventorship of the Hytrel-to-plates bonding, while there is documentation of the fact that, late in October 1976, Anderson was experimenting with different plate configurations that would better "capture" the pad.[13] Further evidence corroborating the defendants' position is that Rodgard manufactured the plates as specified by Anderson.

In early January 1977 another agreement—between Rodgard and Miner—was executed.[14] This "Confidential Information Agreement" specified that Miner would provide internal company information to Rodgard on a confidential basis so as to enable Rodgard to decide whether it would undertake to manufacture components for Miner. The agreement indicated that Miner was to use "diligence and constant effort" to develop devices "for example, compression pads, fabricated by R[odgard]." As a "consequence of R[odgard]'s contribution to the development of suitable compression pads," Miner promised to give Rodgard "primary consideration" as a supplier of said compression pads "in commercial quantities." Paragraph 3 provided that Miner and Rodgard would work exclusively with each other "during the research and development phase" until Miner had received approval from the American Association of Railroads in the form of an "Unconditional Certificate of Acceptance" so that the devices to "be manufactured by M[iner], including the aforementioned compression pads" could be sold for commercial use. The parties further agreed to maintain the information "confidential and secret (whether made available before or after the date of this Agreement)." The agreement went on to provide that Miner could divulge such information to Miner's "authorized licensees abroad * * * for possible use abroad." Paragraph 6 indicated that the agreement could be terminated by "mutual agreement." The last numbered paragraph provided that Rodgard would not use "such confidential information * * * at any time" except as was provided in the agreement or

---

6. TR 191, 527–528.

7. A void is a hollow spot or bubble within the Hytrel material. *See* TR 195–196. It is sufficient for the purposes of this litigation to simply indicate that such voids appear when large amounts of melted Hytrel are cooling; the variance of the cooling rate throughout a large cross-section of melted Hytrel (the outermost material cooling more rapidly than the inner) results in voids.

8. TR 190.

9. Entries of November 10 and 16, 1976.

10. U.S. Patent Application Serial No. 755,050; *see* PX 7A and TR 48.

11. Winfield's testimony at TR 528–529; JX 8.

12. TR 130–131, 369–387, 531; JX 1 (The Patent).

13. DX 37 (October 29, 1976 entries).

14. JX 10.

in any subsequent agreement between the parties.

During 1976 and 1977 different metal plate configurations were developed, fabricated and tested, and several mechanical stress tests were performed on the Hytrel compression springs and on units comprised of the combination of two metal plates bonded—one on each side—to a Hytrel spring.[15] In late 1976 one particular metal plate configuration with protrusions resembling wide "claws" was fabricated at Miner.[16] Such plate was eventually chosen by Anderson as one of two configurations to be mechanically bonded to a Hytrel disk to form a spring unit, and eight such units were stacked together and placed inside a draft gear and were subjected in March and April of 1977 to Miner's "one thousand impact test" to simulate approximately twenty years of device service; the draft gear containing the "claw" configuration successfully completed the test.[17] During that same period, Anderson documented that he had discussed the concept of "punching a hole" in the plate to produce a "significant tear" which would improve the strength of the bond.[18]

The post-test analysis of prototype spring units made up of Hytrel bonded to two metal plates with claw-like protrusions led to the conclusion that such units were suitable for developmental production.[19] Mechanical bonding similar to the "claw" approach was considered acceptable and mechanical bonding was considered the superior bonding method.[20] In a letter from Winfield to Anderson dated May 9, 1977 Rodgard offered to supply Miner with "Hytrel pads, pressed, and mechanically affixed to steel plates" and represented that Rodgard would "fabricate the steel plates to" Miner's "design, as * * * discussed."[21] In the months that followed, the relationship between Rodgard and Miner appeared non-adversarial; Miner on June 7, 1977 issued a purchase order for 2160 pilot production parts from Rodgard, shortly after which Rodgard began the delivery of such parts.[22] At that time, Anderson still was not yet certain of a precise plate configuration that would be commercially viable and of what method would be adopted for commercial production.[23] In early July of 1977, Miner received several plates from Rodgard with different attributes or characteristics, one of which was a plate whose holes had been punched without use of a prior pilot hole.[24] At Anderson's request Rodgard, on July 12, 1977, shipped two additional steel plates with holes punched without pilot holes—i.e., with "jagged" edges.[25] On July 21, 1977 Anderson prepared an "invention record" for mechanical bond designs which he claimed to have conceived in March and which contained sketches made in May, June and July of metal plates considered for use in the Hytrel spring units.[26] Anderson spent one week at Rodgard in late July to experiment with mechanical bonding and press methods.[27] On July 31, 1977, after returning from Rodgard, Anderson noted that the "new extruded holes" in the plates worked quite well, and he began to experiment with the number of holes and their size and location.[28] In October 1977 plates substantially similar to those with jagged edges as previously shipped from Rodgard on July 12 were used successfully in tests to further evaluate the mechanical bonding system.[29] Such mechanical bonding system was intend-

15. DX 37.

16. TR 394, JX 9 and JX 9A.

17. TR 396–400, DX 32 and JX 12.

18. DX 37 (entry of March 30, 1977).

19. TR 203, 415 and JX 15.

20. DX 36.

21. DX 41.

22. JX 15.

23. TR 203 and JX 15.

24. DX 37 (entry of July 11, 1977).

25. PX 95.

26. JX 14.

27. JX 14 (first entry of July 31, 1977).

28. DX 37 (second entry of July 31, 1977).

29. TR 203–204, 208.

ed for use in the pilot production run.[30] Miner determined that a continuation-in-part of the 1976 patent application should be filed incorporating the recent development of the metal plates and the bonding of Hytrel to such and the successful testing thereof performed through October 6th. On October 21 Anderson documented that chemical bonding approaches for use in the spring units developed for draft gears had been abandoned.[31]

In December 1977 Anderson submitted the continuation-in-part[32] application which contained the same inventorship claims regarding the application of external pressure to a solidifying block of Hytrel to eliminate voids.[33] The only significant difference in the continuation-in-part from the original application was that methods of mechanical bonding were added as new claims.[34]

In March 1979 Anderson indicated that he was not the inventor of his application's Claims 5–7 which set forth the technique of applying pressure to solidifying Hytrel in order to eliminate voids; he cancelled such claims.[35] However, Anderson allowed such technique to remain in the descriptive portion of The Patent.[36] The Patent issued on April 15, 1980 and designated Miner as the assignee.[37]

Beginning in October of 1977 Rodgard produced parts for Miner for the pilot program and subsequently supplied parts to Miner in commercial quantities through 1983, for which Miner paid Rodgard $3,000,000.[38]

In May of 1981 in-house counsel for Miner prepared a third agreement in the relevant portions of which Winfield, in exchange for

$150,000 to be paid over five years, agreed to serve as a design and manufacturing consultant in the field of compression springs and specifically agreed to instruct and assist Miner "in setting up a manufacturing line for spring products." The agreement also required that all parties would keep secret all knowledge and information concerning the parties' "business, processes, apparatus, inventions, products, designs, researches, research programs, and formulae that were made known to each other as a result of" Rodgard's work on Miner's "designs or other assignments" unless the parties stipulated otherwise in writing; Miner also promised "to keep confidential [Rodgard's] information for five years" except with respect to "authorized Miner licensees outside [the] U.S.A." The agreement required Winfield "to transfer to M[iner] exclusive and sole rights to any invention, discovery, improvement, or innovation, existing or future, made alone or jointly with others, in connection with or related to services performed under this Agreement and specifically in connection with compression springs."[39]

During the entire time Rodgard commercially manufactured metal plates for Miner, they were of the same basic configuration as those tested in October of 1977,[40] including "purposely torn punched holes."[41]

In September 1981 Winfield received a copy of an internal Miner memo, mentioning a patent on "the ME–101 pad," the process for making same and the use of such in draft gears.[42] On May 28, 1982 Rodgard issued an invoice for work performed under the May

---

**30.** TR 204.

**31.** JX 15.

**32.** "A [continuation-in-part] application is 'an application filed during the lifetime of an earlier application by the same applicant, repeating some substantial portion or all of the earlier application and adding matter not disclosed in the said earlier case.'" *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1436–1437 (Fed. Cir.1984).

**33.** PX 7B (claims 5, 6, 7) and TR 34.

**34.** PX 7B (claims 8–15).

**35.** PX 23.

**36.** JX 1 (col. 2, line 65, though col. 3, line 25).

**37.** JX 1.

**38.** TR 581.

**39.** JX 16.

**40.** TR 550.

**41.** PX 98.

**42.** DX 140. The Miner designation ME–101 refers to any type of Hytrel spring pad and not limited to the use of such in draft gears. TR 1293.

1981 contract which included a reference to "trial runs" of an "ME–101".[43] Pursuant to the terms of the 1981 agreement, Winfield instructed and assisted Miner in installing a complete manufacturing facility for compression springs which incorporated some of Rodgard's manufacturing techniques.[44]

The plaintiffs allege that they did not actually become aware of The Patent until early 1984[45] and, shortly thereafter, this lawsuit was filed. The defendants continued to make the payments to the plaintiffs under the 1981 agreement through 1986 as required.[46]

Concerning joint inventorship *vel non,* the plaintiffs allege that they had worked jointly and in concert with the defendants in the research and development of the method of producing such compression springs (including the use of Hytrel therein) and that the invention was the result of the mutual contributions and united efforts of and had been jointly developed and invented by Winfield and Anderson pursuant to the 1976 and 1977 agreements.

■■■ If a co-inventor is not named in an issued patent, such may be corrected if the error occurred without deceptive intent; otherwise, the patent is void.[47] The inventor named in a patent is strongly presumed to be the true creator of the invention. *Jamesbury Corporation v. United States.*[48] Such presumption may be rebutted only by evidence which clearly and convincingly proves that there was one or more other inventors not named in the patent.[49] The development of an invention requires its mental conception by the inventor, its embodiment in a working model and the refinement of such so as to prove its fitness for the intended purpose or purposes and to substantially embody therein the claims sought to be patented.[50] An "idea" or mental conception in the patent law is "a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice."[51] After a person has thus conceived of an invention, he may use the services and assistance of others to perfect the invention without losing the right to obtain a patent in his sole name.[52] One who is the lone spark which leads to the final invention is the inventor.[53]

■■■ For an invention to be truly joint, it must appear by clear and convincing evidence that two or more persons collaborated in conceiving and evolving the forward step in the particular technology.[54] Joint invention implies that such persons—none of whom as yet having attempted to or, having attempted, been unable to provide a means to achieve the particular and desirable envisioned result—agreed that they would go forward mutually participating in the development and perfection of the conceived forward step. The product of a joint endeavor or collaboration is a joint invention when, "before the entire conception of the invention by one inventor, another meets him and by his consent unites with him in exercising inventive skill upon the development and perfecting of the conception."[55] One who merely performs experiments at the direction of

---

43. DX 146.

44. TR 926–927.

45. DX 141 and DX 144.

46. TR 925–926.

47. 35 U.S.C. § 256.

48. 207 Ct.Cl. 516, 518 F.2d 1384, 1395 (1975).

49. *Amax Fly Ash Corporation v. United States,* 206 Ct.Cl. 756, 514 F.2d 1041, 1050 (1975).

50. *In re Yarn Processing Patent Validity Litigation,* 498 F.2d 271, 275 (5th Cir.), *cert. denied sub nom., Sauquoit Fibers Co., Inc. v. Leesona Corp.,* 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974).

51. *Coleman v. Dines,* 754 F.2d 353, 359 (Fed.Cir. 1985) (quoting with approval from *Gunter v. Stream,* 573 F.2d 77, 80 (C.C.P.A.1978), which in turn had quoted the same from *Mergenthaler v. Scudder,* 11 App.D.C. 264, 276 (1897)).

52. *Hobbs v. United States, Atomic Energy Commission,* 451 F.2d 849, 864 (5th Cir.1971).

53. Op cit at footnote 51, at 360.

54. *Pointer v. Six Wheel Corporation,* 177 F.2d 153, 157 (9th Cir.1949), *cert. denied,* 339 U.S. 911, 70 S.Ct. 570, 94 L.Ed. 1338 (1950).

55. Op cit at footnote 54, at 158.

another is not a co-inventor. However, if one beneficially contributes to reaching the final conception, a claim to inventorship may exist.[56]

■ In this case, there are several items which point to joint-inventorship. Anderson's admissions that he learned from Winfield some of the techniques he later used in finalizing his conception of the patented device and that Winfield had been "screwed" are of great significance.[57] The process that Anderson admitted learning from Winfield of applying pressure to the cooling Hytrel in order to eliminate voids was originally part of the claims listed in Anderson's application filed in 1976 and in his continuation-in-part application filed in 1977. Such process was later canceled from the claims section of The Patent because Anderson realized that he was not its inventor. While such serves to show that Anderson may have been overly zealous in his initial decision to submit the totality as his own idea, such equally shows that he thereafter was willing to cancel any claims to inventorship which he did not believe to be his own. It is clear that Anderson had been working on a Hytrel compression spring for months prior to having Rodgard recommended as a supplier and meeting Winfield. The terms of the 1976 agreement show that the defendants were very interested in the knowledge and skills of the plaintiffs. Miner's internal documents from the early period of its association with Rodgard confirm this. The 1977 agreement specifically refers to "Rodgard's contributions to the development" of Hytrel pads. The search, as documented by Anderson, for methods to bond the Hytrel to metal plates and the supply by Rodgard of several different plate configurations without any documentation supporting their prior design by Miner supports an inference that Winfield or another or others at Rodgard provided the suggested plate configuration modifications. The battle over the inventorship of the metal-plate design and subsequent mechanical bonding method leaves no clear answer as to who invented such. The testimony and other evidence pointed to no fewer than five people who could have actually invented the plate design.[58] The defendants' attempt to demonstrate their meticulous keeping of records provides damaging implications against them when significant stages of development do not have timely and pertinent entries or when claims have no supporting documentation. No one was clearly and convincingly proven to have been the sole designer or a designer; however, the burden did not at trial fall upon the defendants. The burden was on the plaintiffs and, in the final analysis, they have not provided sufficient corroborating evidence to carry the day. While the review of the evidence and the observation of the witnesses at trial leaves doubt as to the credibility and ethics of the defendants, this Court is not clearly and convincingly persuaded that Winfield was a joint inventor of any claim contained in The Patent.

■ The plaintiffs further allege that the defendants failed to comply with 35 U.S.C. § 112 and disclose the "best mode" known to Anderson for effecting the mechanical bond between the Hytrel springs and the metal plates and that therefore The Patent should be declared invalid. The defendants respond initially by asserting that this Court has no jurisdiction over this portion of the case because they have not charged the plaintiffs with infringement of The Patent and the plaintiffs do not have a reasonable apprehension of a case or controversy involving the defendants' charging the plaintiffs or Rodgard's customers with such. A party seeking a declaratory judgment of invalidity presents an independent claim, although jurisdiction must be established.[59] Courts have developed an objective test to evaluate the existence *vel non* of jurisdiction for requests for declaratory judgments in patent cases. If the patentee or assignee does not specifically allege infringement, the court must con-

---

**56.** *Mueller Brass Co. v. Reading Industries, Inc.,* 352 F.Supp. 1357, 1372 (E.D.Pa.1972), *aff'd,* 487 F.2d 1395 (3rd Cir.1973).

**57.** PX 24A (p. 177).

**58.** Ruestow and Winfield at Rodgard; Anderson, Schutzenhofer and Krolikowski at Miner.

**59.** *Cardinal Chemical Co. v. Morton Int'l, Inc.,* 508 U.S. 83, 96, 113 S.Ct. 1967, 1975, 124 L.Ed.2d 1 (1993).

sider and determine whether the totality of the circumstances creates a reasonable apprehension on the part of the plaintiff that the defendant will initiate a lawsuit therefor and the plaintiff must establish a true interest—which may include conduct that well may subject it or its customers to a suit for patent infringement—that can be protected by a declaratory judgment.[60] If both prongs—*to wit*, a reasonable apprehension and a protectable interest—have been satisfied, a court is thereupon fully possessed of jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201, to address the merits of the claim. During the course of conducting business, Rodgard received notice from customers of their concern about and interest in avoiding "a patent infringement situation".[61] Rodgard responded to such inquiries by promising "to intervene and to conduct the defense in any infringement suit which Miner" (or its assignee) might bring.[62] Furthermore, the defendants themselves have adduced evidence of several instances of Rodgard's providing products to other parties which the defendants allege incorporated or made use of some of the concepts contained in The Patent's claims.[63] Such circumstances adequately support the reasonability of Rodgard's apprehension of a likely infringement suit assuming the continuation of such conduct and pending the outcome of this litigation. That Rodgard has a protectable interest is substantiated by much of the same evidence; the communications from Rodgard's customers clearly show their concern regarding potential infringement claims. Furthermore, Miner's production process and equipment was procured through Rodgard; essentially, Miner's facility imitated Rodgard's and the installation thereof was enabled and assisted by Rodgard and Winfield. There is no issue whether the plaintiffs had made meaningful preparation to make and sell devices facially subject to an infringement charge; Rodgard clearly had the capacity to produce the components making up the springs comprising The Patent, having previously—at least through 1981—been Miner's sole supplier of such components,[64] and there was no evidence that Rodgard's equipment had become obsolete or non-functional. On the contrary, the defendants allege that Rodgard, by designing and selling Hytrel products, impeded their "advantageous [and] exclusive" design and manufacturing position they believe they had enjoyed at some point.[65] In light of the factors presented, this Court finds that Rodgard has an interest that would be properly protectable by a declaratory judgment of invalidity. Therefore, this Court proceeds to evaluate the merits of such claim.[66]

A patent is presumed to be valid.[67] 35 U.S.C. § 112 requires that a patent specification set forth the manner and process of making and using the invention (known as the enablement requirement) and also that it must describe the "best mode" then known to the applicant for the carrying out of the invention.[68] These two requirements are distinct. The nature of the enablement requirement is that the application must "disclose an invention in such a manner as will enable one skilled in the art to make and utilize it."[69] The essence of the best mode requirement is that the applicant must disclose the best mode and manner and means contemplated by him for carrying out the invention.[70] Failure to satisfy either requirement invalidates the patent.[71]

---

60. *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736–737 (Fed.Cir.1988).

61. DX 59.

62. DX 60.

63. TR 589, TR 1023, DX 63 and DX 110.

64. JX 16 and DX 46.

65. Defendants' Proposed Findings of Fact and Conclusions of Law, page 46.

66. The participants did not address the likelihood that 28 U.S.C. § 1367 provides this Court with alternative authority to reach the merits in this instance.

67. 35 U.S.C. § 282.

68. *Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1532 (Fed.Cir.), *cert. denied*, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987).

69. *Application of Gay*, 50 C.C.P.A. 725, 309 F.2d 769, 772 (1962).

70. Op cit at footnote 69, at 772.

71. Op cit at footnote 68, at 1538.

The parties do not dispute that the enablement requirement has been fulfilled. The instant dispute centers on the compliance *vel non* with the best mode requirement. Failure to comply with the best mode requirement must be proven by clear and convincing evidence.[72] In order to demonstrate that a patentee has failed to disclose the best mode, it must be shown that the patentee (1), at the time the application was filed, knew of a preferred mode—as compared with that which was set forth—of carrying out the invention and (2) withheld and concealed such preferred mode.[73] The first inquiry is subjective and evaluates the patentee's knowledge or awareness of a better mode necessitating the disclosure of such while the second, once the first inquiry has been answered in the affirmative, is primarily objective concerning the adequacy of such disclosure.[74] Even unintended or unknowing concealment of a best mode known, at the time the application was filed, to exist invalidates the related claims.[75] The patent is written for those skilled in the art, therefore not every detail or minutia needs to be included;[76] although manufacturing specifications are not required *per se*, if such information is necessary to practice the preferred mode of the invention, such must be disclosed.[77] A general reference to a best mode is not sufficient, especially if the quality of the disclosure is so poor that it effectively conceals the true best mode.[78] Factors to be considered in determining whether concealment occurred include whether the information disclosed follows or is contrary to criteria contained in the literature in the specific field of art under consideration,[79] and whether the patentee included fictitious and inoperable modes in his disclosure.[80]

In April 1977 Anderson documented his belief that an approach using mechanical bonding and incorporating a claw-like configuration was acceptable.[81] In May 1977 he documented that a draft gear containing eight spring units had successfully completed a simulated 20–year life test.[82] Such units incorporated or made use of metal plates that contained claw-like protrusions.[83] Between May 21 and July 21 of 1977 Anderson produced several drawings of metal plates, none of which depicted the plates used in the successful May test, but which are notably similar to the plates illustrated in The Patent.[84] The last two drawings, produced on July 21 and labeled ME–101–4DA and ME–101–4DB, bear a notation indicating that the protrusions were to have "torn edge[s]". In the same document, it is noted that Anderson then was aware that chemical bonding was no longer being pursued. In a memo dated October 21, 1977 Anderson documented that he had developed the Hytrel spring invention to the point were it had become "suitable for use" in a commercial product—explaining that the development had not been easy—, stated that "[c]ountless avenues were explored and abandoned * * *", repeated that chemical bonding had been abandoned and noted that mechanical bonding had been

**72.** *Therma–Tru Corp. v. Peachtree Doors Inc.*, 44 F.3d 988, 993 (Fed.Cir.1995).

**73.** *Engel Industries, Inc. v. Lockformer Co.*, 946 F.2d 1528, 1531 (Fed.Cir.1991).

**74.** *Chemcast Corp. v. Arco Industries Corp.*, 913 F.2d 923, 928 (Fed.Cir.1990).

**75.** Op cit at footnote 68, at 1535.

**76.** *DeGeorge v. Bernier*, 768 F.2d 1318, 1323 (Fed.Cir.1985).

**77.** Op cit at footnote 74, at 930.

**78.** Op cit at footnote 68, at 1536.

**79.** Op cit at footnote 68, at 1536 (best mode violated in part because patentee failed to disclose its specific actual brazing method, known by the patentee to be contrary to the criteria in the literature).

**80.** *Consolidated Aluminum Corp. v. Foseco Intern. Ltd.*, 910 F.2d 804, 808–809 (Fed.Cir.1990) (disclosure of fictitious mode supports determination that patentee intentionally concealed and engaged in inequitable conduct).

**81.** DX 36.

**82.** JX 12, DX 34 and TR 399–400.

**83.** TR 399–400, 440, JX 9 and JX 9A.

**84.** JX 14.

adopted using a method which "violates good punch press practice in metal forming." [85]

From Anderson's invention records, one can see that some of the drawings he made between June 21 and July 21, 1977 were the predecessors to several of the illustrations in The Patent. The drawing labeled ME 101–4C from his invention record led to Figs. 10A & 10B in The Patent, drawing ME 101–4F led to Figs. 9A & 9B, ME 101–4D to Figs. 8A & 8B and ME 101–4DB to Figs. 5 and 6 (with a significant omission in the final drawing—*i.e.*, a reference to "torn edge" in the invention record is conspicuously missing in The Patent illustrations and is not to be found anywhere in the body of The Patent).

The first inquiry is whether Anderson contemplated a preferred mode of the embodiment of Claims 6–11 and 14–15 related to bonding metal plates to Hytrel springs on or before the filing of a continuation-in-part application for The Patent. This Court finds that he did. It is clear that chemical bonding had by then been abandoned, that by April 20, 1977 a stringent lifetime test had been successfully performed on units which had "improved mechanical bond—[the] forerunner of [the] current system," that the method chosen involved a one-step process in which a plate had the holes punched through it without any pilot hole (in violation of accepted punch press techniques), and that such method resulted in annular protrusions with very jagged edges. This Court finds that the plates produced by Rodgard for Miner prior to December 1977 were virtually identical to one of the plates adduced at trial, that such plate is substantially similar to the actual plates used in production at Miner and that such represented the preferred embodiment of the plates to be attached to the spring pad

to form a compression spring unit at the time the continuation-in-part application was filed.[86]

The next pertinent inquiry is whether The Patent adequately discloses such preferred mode and is to be made in the context of claims referring to metal plates—namely, Claims 6–11 and 14–15.[87] To properly address the question of the adequacy *vel non* of the disclosure, this Court begins with the language used in The Patent's description of the specific embodiment. Therein, Anderson indicates that he had found it "difficult" to obtain a chemical bond. Such is an understatement and a not-so subtle misstatement. As indicated at trial and in the internal documents produced by the defendants, Anderson never achieved a chemical bond and had abandoned such approach. He then states in The Patent that he "developed a relatively simple procedure for obtaining a mechanical bond between the springs and plates." [88] This Court might agree that the procedure is relatively simple, but the defendants concede that the development itself was anything but easy; standing alone however and with the benefit of 20–20 hindsight, such is not a misstatement. Anderson goes on to specify that "[t]he projections 30 may be continuous, integral portions of the plate 26', as illustrated, or may be composed of plural sections, and may be welded or otherwise bonded to the plate 26' rather than integrally formed as by means of a punching operation." [89] Such is the only reference to a punching operation in The Patent, and well might not alert a person skilled in the art of pressing or punching metal that the methods actually used by the inventor violate accepted press practices in metal forming.[90] This failure to

85. JX 15.

86. TR 550.

87. Claim 12 claims a method of making a "multi-tiered compression spring assembly" and Claim 13 claims the product from the method in Claim 12. Although Hytrel spring pads and metal plates are mentioned in these claims, very little, if any, testimony related to the method and product claims specifically contained in Claims 12 and 13, although they are dependent from Claim 1 (method of making a compression spring). There was no evidence presented showing depen-

dence from the other claims making use of metal plates (*i.e.*, Claims 6–11 and Claims 14–15).

88. JX 1 (col. 4, lines 66–68).

89. JX 1 (col. 5, lines 18–25). Fig. 4 has a reference to a plate 26, Figs. 5–7 have a reference to a plate 26', Figs. 8A & B have references to a plate 26″ and Figs. 9A & B have references to a plate 26‴. Such references are to different configurations of the protrusions from the plate.

90. JX 15.

disclose a method that is contrary to field-accepted criteria aggravates this Court's perception that the disclosure is so poor as to have possibly intentionally or constructively concealed the contemplated best mode. The references to welding and other bonding methods serves to obscure further the fact that the preferred embodiment involved projections formed by using a punching method producing plates having protrusions with sharp, uneven and jagged edges. Anderson goes on to state in The Patent that he "prefer[red] that the projections may be splayed slightly outwardly at their outer tips *as shown* to help strengthen the mechanical bond. The tips may also be cut and bent to produce a rough edge *similar to that illustrated.*" (Emphasis added.) [91] While the general reference to "splayed slightly outwardly" is an accurate description of the best mode contemplated, the restrictive "as shown" again serves to mislead, confuse and possibly conceal the truly-contemplated best mode. The reference to "a rough edge" is also accurate but, in the context of "cut and bent" and with the reference to the illustration, such serves only to conceal, in that no cutting or bending is necessary in the best mode contemplated and there is no cutting or bending apparent from the illustration. Although in isolation the description of "rough edge" does not conceal, the "rough edge similar to that illustrated" does not adequately depict the serrated edges displayed at trial and contemplated in the best mode; the overall effect is to conceal the actual best mode contemplated. This Court views as very significant that, in The Patent, Anderson stated that he "presently regard[ed] plates according to F[igs]. 5 and 6 to be the most preferable" considering all things including costs and technology, and "the best possible surface incongruities used to obtain the mechanical bond between the plates and the elastomeric spring." [92] However, Anderson testified—albeit reluctantly—that the items depicted in Figs. 5 and 6 had not been produced prior to his application and were not produced or used in assemblies after The Patent had issued. [93] Such evi-

dence of a fictitious mode disclosed in The Patent's specification contributes to the perception that the disclosure was so obtuse as to conceal. Finally, the earlier invention record drawings depicting plates ME 101–4DA and ME 101–4DB both contained references to a "torn edge" and which this Court believes is an accurate description which would have improved the specification's description of the best mode contemplated. Courts are comprised of laypersons and generally are not experts in the field of art pertinent to a particular patent and at issue in the dispute over the adequacy *vel non* of a best mode disclosure in a patent. The instant plaintiffs did not present sufficient evidence to allow this Court to find that one skilled in the art would or would not have understood the best mode from the disclosure. Although it is clear that the preferred mode violated punch press practice in metal forming, there is no evidence that one skilled in punch press practice would not or could not have discerned the best mode contemplated; in fact, it is reasonable to assume that one skilled in the art who is knowledgeable about generally accepted metal punch press practices must also know about approaches that are not deemed "good practice" to be capable of distinguishing a practice which is accepted from that which is not. Furthermore, it is not apparent to this Court whether a person skilled in the art of bonding metal to non-metals would or would not have been enlightened as to the patentee's best mode contemplated. Although the disclosure is not as clear as it could be—and a simple measure of the weight of the evidence presented leads this Court to infer that the disclosure actually concealed the best mode—, such is not the standard of review to be applied. The burden of persuasion was on the plaintiffs to convince this Court by clear and convincing evidence that the defendants had not complied with the best mode requirement. The plaintiffs have not sustained their burden.

The plaintiffs' remaining causes of actions particularize into four claims—*viz.,* misap-

---

**91.** JX 1 (col. 5, lines 26–30).

**92.** JX 1 (col. 6, lines 50–56).

**93.** TR 244–251.

propriation of a trade secret, fraud, breach of a fiduciary duty and breach of contract.

 In order to recover for misappropriation of a trade secret, the law of New York requires that a plaintiff prove (1) that he possessed a trade secret and (2) that the defendant used such trade secret in breach of, among other things, an agreement or a confidential relationship.[94] A trade secret includes any information or compilation of information which is closely held and used in one's business and which gives its owner an advantage over competitors who do not know it. Some of the factors to be considered in determining whether one possessed a trade secret include

"(1) the extent to which the information is known outside of his business; (2) the extent to which the information is known by employees and others involved in his business; (3) the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." [95]

An examination of the presented evidence as it relates to the above-listed factors—especially to the plaintiffs' conduct—does not show that the plaintiffs possessed a trade secret. The defendants acknowledged in internal memos that Rodgard was well ahead of the industry in its techniques, that such was confirmed by DuPont and that their process as well as their costs were substantially better than available alternatives.[96] It is also very significant that the defendants admitted that Rodgard was the only known firm in the world using its low cost system.[97] Thus the first factor weighs in favor of the plaintiffs and of the existence of a trade secret. Although it was not clear how much information about the technique of applying

pressure to the solidifying Hytrel was known to Rodgard's employees outside of Winfield, the discussion regarding the first factor applies equally to the second factor and favors the plaintiffs. The third factor provides a determinative influence. Although the defendants .produced evidence that none of the employees at Rodgard was required to sign a confidentiality agreement and that Rodgard's manufacturing operations were performed in a building occupied by other tenants, Rodgard's operation was very small relative to Miner's and its other competitors and internal confidentiality agreements and monitoring techniques appear not to have been necessary. The adequacy of Rodgard's precautions is supported by the fact that Rodgard was the only firm in the world practicing such techniques, thereby proving that whatever measures it was taking were adequate prior to its encounter with Miner. However, Rodgard in the 1976 and 1977 agreements gave Miner the right to disclose any information abroad and this specific right was never withdrawn by any of the later agreements. Such right of disclosure abroad destroys any claim of trade secrecy advanced by the plaintiffs. In this case, the secrecy and the measures taken to guard it are the most important factors.[98] The evidence as to this factor weighs in favor of the defendants. Even though the 1977 agreement placed some restriction upon foreign disclosure by requiring similar confidentiality agreements from anyone to whom such information was to be disclosed, the plaintiffs' ability to guard against improper disclosure seems non-existent if the pertinent arena is strictly domestic, which it was. Free disclosure abroad, even so fettered, does not equate to secrecy. Moreover, the final agreement between the parties permitted the defendants to disclose without practical limitation any information they received from the plaintiffs beginning in 1986. Therefore, the damages for any misappropriation of a trade secret, even if such occurred,

94. *Hudson Hotels Corp. v. Choice Hotels Intern.*, 995 F.2d 1173, 1176 (2nd Cir.1993).

95. *Integrated Cash Mgmt. Serv. v. Digital Transactions*, 920 F.2d 171, 173 (2nd Cir.1990) (quoting *Eagle Comtronics, Inc. v. Pico, Inc.*, 89 A.D.2d 803, 453 N.Y.S.2d 470, 472 (4th Dept.1982)).

96. PX 31 and JX 8.

97. PX 31.

98. *See Lehman v. Dow Jones & Co., Inc.*, 783 F.2d 285, 298 (2nd Cir.1986).

would have to have been proximately caused by the defendants' early disclosure, and not by disclosure *per se*. The defense attempted to establish that the fourth factor weighs against Rodgard's possession of any valuable trade secret by proving that, when Rodgard re-incorporated in New York, it assigned a value of $50,000 to all the intangibles it possessed, part of which included a value for any trade secrets.[99] While the relatively small value for this asset probably does weigh in favor of the defendants, such self-valuation has little probative value on the issue of trade secret *vel non*, but would provide a benchmark measure for damages if liability were to be found. There was no adequate evidence provided regarding the fifth factor; therefore it plays no role in the determination. Concerning the evaluation of the sixth factor there is, on the one hand, the internal documentation of the defendants that Rodgard's "techniques could easily be copied." On the other hand, however and despite such alleged ease, Miner required Winfield's and Rodgard's assistance to duplicate such, thereby contradicting its own internal document. Further, the May 1981 agreement provided that Miner was to pay $150,000 for Winfield's and Rodgard's instruction and advice in the installation of a manufacturing facility but, as will be discussed more completely, it did not provide Miner with the permission of disclosing any information for a period of five years. While the fact that Rodgard was the only firm in the world practicing the techniques speaks volumes in support of the secrecy it claims to have maintained over its processes, that it gave permission to the defendants to disclose abroad any confidential information obtained as a result of their relationship creates doubt as to the existence of a trade secret related to such information when The Patent issued. This Court finds, after carefully reviewing and weighing the evidence presented, that the plaintiffs have not sustained their burden of proving by a preponderance of the evidence that it had a trade secret. With such finding, a review of the novelty *vel non* of such process is not necessary.

▌ To recover on their fraud claim, the plaintiffs must have proven by clear and convincing evidence that the defendants knowingly made a false representation the purpose of which was to induce the plaintiffs to rely on such, that the plaintiffs reasonably did rely on such and that the plaintiffs resultantly suffered actual harm.[100] The defendants affirmatively raised a statute of limitations defense to the plaintiffs' fraud claim. In New York, an action for fraud must be commenced within six years of the commission of the fraud or within two years from its discovery, whichever is later.[101] January 12, 1977, approximately one month after the filing of the first patent application, Miner entered into its second and more formal agreement with Rodgard and Winfield which confirmed that any information regarding the development and production of the product was to be maintained confidential and secret and which contained a specific disclaimer allowing Miner the aforenoted exception for the disclosure of such information abroad. At the time they were entering into such agreement, Miner clearly knew that it intended to try to obtain a domestic patent. Even more significant is the fact that Anderson included in his initial patent application, in direct contravention of the promised confidentiality, techniques that he had learned from Winfield and/or Rodgard. At this point, the defendants' delineation that they would keep all disclosures confidential clearly misrepresented their true intention to domestically disclose the plaintiffs' techniques in their patent; the purpose of such misrepresentation regarding confidentiality was to induce the plaintiffs to rely on such, which the plaintiffs reasonably did. Therefore, the plaintiffs were fraudulently induced to enter into the agreement on January 12, 1977 which then is the date the cause of action accrued for the purposes of the statute

**99.** TR 1093–1095.

**100.** *Apex Oil Co. v. Belcher Co. of New York, Inc.,* 855 F.2d 997, 1008 (2nd Cir.1988); *Warner v. Lucas,* 185 Ill.App.3d 351, 133 Ill.Dec. 494, 495, 496, 541 N.E.2d 705, 706, 707 (1989).

**101.** New York Civil Practice Law and Rules, §§ 213(8) & 203(g). Although both sections have been amended subsequent to the filing of this action, such amendments have no material bearing on this case.

of limitations.[102] The six-year period within which the plaintiffs were required to bring this cause of action expired January 13, 1983. The Patent ultimately issued April 15, 1980 and the world had constructive notice of its existence and contents.[103] There is no evidence that the plaintiffs could not have obtained actual notice of the fraud with due diligence, and this Court does not find that the plaintiffs reasonably investigated such. They are charged with such knowledge. The defendants did not—and could not—conceal the existence of The Patent in any manner after its issuance. This is confirmed by the fact that the defendants freely provided the plaintiffs with a copy of an internal Miner memo addressed to Anderson dated September 22, 1981 which discussed the "patent on the ME–101 Pad and process of making same" and contained a reference to a draft gear as well as references to stacks of pads.[104] The constructive notice provided by the issuance of The Patent preceded by more than two years the expiration of the six-year period of limitations; therefore the time within which suit therefor could be filed was not extended by the discovery rule. The plaintiffs filed their Complaint in this lawsuit on April 15, 1984, more than one year after the period of limitations for fraud associated with the 1977 contract had expired, thereby barring the plaintiffs' associated claim for relief. The constructive notice produced by the issuance of The Patent also prevents the plaintiffs from successfully alleging any reasonable detrimental reliance on assertions or covenants contained in the written agreement entered into by the parties in May 1981 that are contrary or inconsistent with the contents of The Patent. This Court also notes that, even if the fraud action were not time barred, the plaintiffs have failed to prove the necessary element of actual damages, which is similarly fatal in any event to their instant allegations of fraud.[105]

Next to be examined is whether the defendants used information in breach of a confidential relationship or in breach of an agreement.

The imparting to another person of confidential information does not *per se* create a fiduciary or confidential relationship and bind the "impartee" not to divulge.[106] The plaintiffs have failed to prove that the requisite confidential relationship existed prior to their disclosure to the defendants of confidential information and that such relationship was the ambience or impetus for the disclosure. This Court finds that such disclosures were made during the course and as a result of arm's-length business negotiations and transactions and that no fiduciary duty arose out of or was created by any confidential disclosure.[107] Such negotiations and transactions occurred during the formation of and subsequent performance pursuant to the parties' contractual relationship. The first evidence of such relationship is provided by the "protocol agreement" of July 12, 1976 which very loosely outlined the agreement that Miner would pay for tooling and material in exchange for which Rodgard would supply Hytrel spring pads to Miner; tangential to the primary purpose of this agreement, Rodgard was to divulge manufacturing techniques to Miner in exchange for Miner's promise to give Rodgard preferential consideration for future domestic production. The second written agreement, dated January 12, 1977, elaborates and expands on the prior contract; therein it was promised that Miner would provide information to Rodgard on a confidential basis so as to permit Rodgard to decide whether to pursue the manufacturing of devices for Miner, that Miner would give Rodgard primary consideration as a manufacturer in commercial quantities, that the parties were to work exclusively with each

**102.** *In re Ply*Gem of Laurel, Inc.*, 91 A.D.2d 513, 456 N.Y.S.2d 382, 383 (1st Dept.1982).

**103.** *Sontag Stores Co. v. Nut Co.*, 310 U.S. 281, 295, 60 S.Ct. 961, 967, 84 L.Ed. 1204 (1940).

**104.** DX 142.

**105.** *Hanlon v. Macfadden Publications, Inc.*, 302 N.Y. 502, 510, 99 N.E.2d 546 (1951); *Shah v.*

*Chicago Title & Trust Company*, 119 Ill.App.3d 658, 75 Ill.Dec. 357, 360, 457 N.E.2d 147, 150 (1983).

**106.** *United States v. Reed*, 601 F.Supp. 685, 715 (S.D.N.Y.), *rev'd on other grounds*, 773 F.2d 477 (2nd Cir.1985).

**107.** TR 521, 581, 623–624.

other to the extent possible in the development of their manufacturing project and that the parties agreed to maintain their information "confidential and secret" except that Rodgard agreed that the information could be divulged with some restrictions non-domestically and that this second agreement was to be and remain effective unless and until mutually agreed otherwise or some other durational restriction not relevant to this case became effective. The third and last agreement was entered into in May of 1981. Therein and thereby Winfield was hired as a consultant to Miner, his most significant charge or assignment being to assist Miner in setting up a manufacturing line for Hytrel spring products similar to Rodgard's; the longest paragraph in such agreement confirmed the confidential nature of the work done and that both parties were to keep "secret all knowledge or information" as to inventions and products that were made known by one to the other during the course of their work on Miner's products. Miner further promised that any information received as a result of such agreement would not be disclosed in this country for five years.

■■■ This Court finds that the defendants breached the express terms of the second contract. By allowing The Patent to issue with the disclosure to all and sundry of the plaintiffs' manufacturing processes and techniques, the defendants disclosed technology which they admittedly had learned from Winfield and Rodgard and which they had promised not to disclose domestically. Allowing such issuance improperly disclosed the methods and techniques earlier divulged by the plaintiffs to the defendants. Contrary to some of the intimations put forth by the defendants, there is no requirement that the plaintiffs assert any claim of or demonstrate novelty in order to establish a breach of such contract. Even if the plaintiffs' technology was not novel (which, from the evidence, is highly unlikely based upon the extraordinary difference in costs of production outlined by the defendants' own internal documentation and the fact that no other manufacturer had

used the techniques), the restricted use of such techniques can be of great value when, as here, the buyer of such technology does not have to expend resources developing comparable methods through other channels and by having the use of the improvements sooner, thereby increasing its profits.[108] Confidentiality within the United States was part of the consideration Miner offered to Rodgard in exchange for the services to be rendered and the technology to be divulged by the plaintiffs. When The Patent issued, Miner had neither purchased nor been given the right to disclose domestically Rodgard's techniques in this country and had only the right to make use of such. However, notwithstanding the fact that the plaintiffs proved that the defendants had breached the terms of the 1977 agreement, the plaintiffs failed to demonstrate what, if any, damage resulted to them from such breach.

The final agreement does not protect or absolve the defendants; they had earlier and materially breached the second agreement, and the third and final agreement did not contain a specific clause releasing them from any liability for their earlier breach. In any attempt to determine the terms covered by the parties' meeting of the minds in this context of previously existing and ongoing business relations in which one party claims that a subsequent contract released it from liability for its previous breaching conduct, such a release from liability must be more clearly expressed than has been shown in this case. Under the circumstances at issue and examining the language and conduct of the parties, no such release can be implied from the language of the agreement entered into in May 1981 or their subsequent conduct and course of performance as having been within their contemplation. In fact, it appears to this Court that some of the language in the last agreement may have been an almost deceitful attempt by the defendants to protect themselves from their earlier inequitable conduct.

Contracts can be modified but, in this case, no modification occurred that incorporated

---

**108.** *Apfel v. Prudential–Bache Securities Inc.*, 81 N.Y.2d 470, 478, 600 N.Y.S.2d 433, 616 N.E.2d 1095 (1993).

the acts amounting to a breach by the defendants. To be clear, the breach was the disclosure by the defendants in The Patent of the plaintiffs' manufacturing processes or techniques in contravention of express contract terms specifically prohibiting domestic disclosure.

 The May 1981 agreement provided that Winfield was to be paid $150,000 over five years in exchange for helping install a manufacturing facility at Miner and that Miner was to maintain for the duration of the agreement the confidentiality of any and all information disclosed by the plaintiffs—which Miner, having already disclosed the technique for eliminating voids in The Patent, could not do. In fact, the plaintiffs had fully performed their obligations of installing the manufacturing facility at Miner prior to their actually discovering the defendants' inequitable conduct. Therefore, having fully performed the tasks required of them under and by the contract, the plaintiffs were entitled to receive the monetary benefits of their bargain, and still could sue for damages caused by the defendants' divulgences. The defendants maintain that the acceptance of the last two payments due under the contract after the filing of this lawsuit ratified their conduct. Ratification is one manner by which a party loses the power to void a contract.[109] However, in this case, the plaintiffs do not assert any power to void the contract, and the plaintiffs' acts did not amount to any type of a ratification as alleged by the defendants. Having fully performed, there was nothing left for the plaintiffs to void and, by timely bringing this suit, the plaintiffs clearly manifested that they did not ratify the conduct of the defendants. Furthermore, "[i]t is hornbook law that when a breach of contract occurs, the injured party may *either* retain the benefits and obligations of the contract and sue for damages *or* declare the contract terminated and perform no further."[110] Having fully performed, the lat-

ter option was no longer available to the plaintiffs and they certainly could receive and retain the benefits thereof prior to initiating this lawsuit. Finally, the specific breach recognized by this Court is the breach of the 1977 agreement which occurred in 1980 when The Patent disclosed the plaintiffs' void-elimination technique. It was just and equitable for the plaintiffs to retain the last two payments made under the terms of the 1981 contract and after this lawsuit had been initiated.[111]

 Defendants repeatedly assert that the contract of 1981 assigned all rights associated with the production of the Hytrel spring pads and units to Miner, including the method of eliminating voids. The defendants fail to include a crucial limitation—*viz.*, that a requirement of the contract was that Miner keep any such information domestically confidential for a period of five years, or until 1986. Furthermore, the defendants' assertion that the language of the contract expressly transferred the process of eliminating voids—while admittedly one possible interpretation—is not the most reasonable interpretation thereof. Such is to be reasonably interpreted as supported by the facts of this case, and any ambiguities or vagueness is required to be construed against Miner as the drafter.[112] The language transferring to Miner all rights "to any invention, discovery, improvement, or innovation, existing or future, made alone or jointly with others, in connection with or related to services performed under this Agreement and specifically in connection with compression springs" limits the scope of the transfer. The limitation on any transfer is the conjunctive requirement that the invention must be specifically related to compression springs and related to the services to be performed. The plaintiffs' technique of applying pressure to Hytrel to eliminate voids has no specific connection to compression springs; such technique and re-

---

**109.** *Restatement, Second, Contracts* (1981), § 380 and cmt. a.

**110.** *McDonald's Corp. v. Robert A. Makin, Inc.*, 653 F.Supp. 401, 405 (W.D.N.Y.1986).

**111.** TR 1035.

**112.** *Bank of Silvis v. Boultinghouse Auction Co.*, 71 Ill.App.3d 98, 27 Ill.Dec. 455, 457, 389 N.E.2d 267, 269 (1979); *Highland Mech. v. Herbert Const. Co.*, —— A.D.2d ——, 628 N.Y.S.2d 655, 656 (1st Dept.1995).

lated process was known to and used by the plaintiffs before any request from Anderson or Miner for assistance. A broad interpretation such as is suggested by the defendants would equate to a sale of a substantial portion of Rodgard's operations; such was clearly not contemplated by the parties. If Miner wanted to purchase all of the rights to the processes involving Hytrel to the exclusion of Rodgard, it knew how to express such specifically in the terms of a contract.

■ Alternatively, the defendants argue that the plaintiffs' acts should estop them from bringing claims for fraud and for breach of contract. Estoppel is an equitable remedy which requires that the party invoking such must do so with clean hands;[113] the defendants do not come to this Court with clean hands and therefore cannot assert estoppel.

■ The amount recoverable as damages for the breach of a contract is that that is reasonably foreseeable and within the contemplation of the parties.[114] It is this element that the plaintiffs failed to meet and satisfy at trial. In fact the defendants elicited an admission from Winfield that, indeed, the plaintiffs had not suffered any economic harm.[115]

This lack of any provable economic harm prevents recovery by the plaintiffs of compensatory damages on the contract claims. Although the plaintiffs have proven that the defendants breached the promise of domestic confidentiality as expressed in the 1977 agreement and repeated in the 1981 agreement (although promising confidentiality only until 1986 in the latter), the defendants' proof that the plaintiffs had no evidence of any economic harm directly and proximately caused by the defendants' breachful conduct in the form of the improvident disclosure is equally fatal to both the plaintiffs' fraud claims and their breach of contract claims.

■ As remaining matters, the plaintiffs allege that the defendants were unjustly enriched as a result of their improper conduct and seek recovery of the same via a constructive trust or comparable arrangement. While a constructive trust may be imposed in certain instances to redress unjust enrichment resulting from fraudulent conduct, there was in this case no proof as to how the defendants were unjustly enriched. Prior to the 1981 agreement, the defendants had purchased Hytrel parts produced by Rodgard and, during the course of their relationship and up to 1983, Miner paid approximately three million dollars to Rodgard.[116] By the terms of the 1981 agreement, the defendants purchased the right to use the trade secret and disclose it abroad, and any gains derived therefrom cannot be said to have been improperly achieved. If there were a claim to compel the defendants to disgorge any unjust enrichment, such would of necessity be limited to such profits derived from and because of the improper domestic disclosure, but not from The Patent itself or its claims. This Court does not find any proof establishing that the defendants were unjustly enriched by or because of their conduct of having improperly disclosed the plaintiffs' manufacturing processes and techniques of eliminating voids such that a constructive trust should be imposed on such improper gains. While it may be true that the defendants did not purchase the right to disclose the information contained in The Patent, the plaintiffs have failed to prove any damages or improper gains proximately resulting from such disclosure.

The plaintiffs allege that the defendants breached the covenant of good faith which, along with fair dealing, is implied in every contract in both Illinois and New York.[117]

113. *Corning Glass Works v. So. New England Telephone,* 674 F.Supp. 999, 1012 (W.D.N.Y.), *aff'd per curiam,* 835 F.2d 451 (2nd Cir.1987); *International Paper Co. v. Grossman,* 541 F.Supp. 1236, 1241 (N.D.Ill.1982), *aff'd,* 725 F.2d 687 (7th Cir.1983).

114. *Travellers Intern., A.G. v. Trans World Airlines,* 41 F.3d 1570, 1577 (2nd Cir.1994); *Nat.*

*Union Fire Ins. Co. v. Continental Ill. Corp.,* 658 F.Supp. 781, 795 (N.D.Ill.1987).

115. TR 628 and DX 120.

116. TR 581.

117. *Harris Trust and Sav. Bank v. Salomon Bros., Inc.,* 832 F.Supp. 1169, 1176 (N.D.Ill.1993); *Filner v. Shapiro,* 633 F.2d 139, 143 (2nd Cir.1980).

However, such does not provide a cause of action independent of those matters already discussed.[118] Good faith *vel non* has been implicitly considered as part of this Court's evaluation of the fraud and breach-of-contract claims and needs no further elaboration.

The plaintiffs' claim for damages arising from any or all disclosures by Miner outside of this country has no basis. The 1976, 1977 and 1981 agreements all contained provisions whereby Miner could disclose information abroad and outside the domestic marketplace, notwithstanding any potential detriment to Rodgard. Even if this Court had jurisdiction to entertain the claims related to Miner's foreign patents and the disclosures therein of the plaintiffs' processes, all the written agreements between the parties contained provisions expressly granting to Miner the right to disclose abroad any information obtained from the relationship.

 Although the plaintiffs failed to prove actual damages so as to sustain any recovery on their claims, there remains no doubt that the defendants' conduct was not forthright. Nevertheless, such conduct does not present such egregiousness to warrant imposing punitive damages. There must be aggravating circumstances or outrage, or some evidence of ill will, evil motive, spite or malice to justify an award of punitive damages.[119] In cases alleging fraud closely related to claims for breach of contract, there must be morally culpable behavior amounting to fraud upon the public.[120] Punitive damages are not justified in this case.

The plaintiffs have also sought attorney's fees. This Court finds that the parties advocated their positions vigorously, legitimately and reasonably and does not find this to be an "exceptional case" that warrants an award of attorney's fees under 35 U.S.C. § 285 or otherwise in light of the fact that the plaintiffs did not prevail on any of their patent claims.

 The defendants have counterclaimed for breach of the May 1981 agreement, contending that Winfield and Rodgard accepted employment detrimental to the interest of Miner in contravention of the 1981 agreement. The specific language prohibited Winfield or Rodgard from accepting any "employment or assignments detrimental to the interests of M[iner] with regard to the above-mentioned compression springs during the existence of this agreement." The referenced springs are those related to "spring products such as the RF–11, which * * * is used in [Miner's] RF–444 Draft Gear." A reasonable interpretation of the consulting agreement, taking into account all the relevant language in the contract as well as the relationship between the parties and business realities is that Winfield and Rodgard were to help install compression-spring manufacturing capabilities at Miner similar to Rodgard's and to refrain from competing with Miner's draft-gear spring products. In the light of this interpretation, the defendants' proof at trial that the plaintiffs pursued ventures with another manufacturer in relation to a "truck" or "railway car" "side bearing" does not show conduct rising to a breach. Such products were not draft gears; in fact, one was so different as to merit an independent patent.[121] The defendants hinted that such product was substantially similar to the spring products Rodgard had made for Miner, but such intimation was not at all substantiated. To interpret the agreement as drafted by Miner to prohibit any activity by Rodgard or Winfield in the field of Hytrel products that are not similar to RF–11 as produced for and by Miner would be overreaching and unreasonable. The plaintiffs understood that Winfield was to provide assistance in installing a production facility and that they then were not to engage in any activity that competed with the production of the draft-gear products from such facility,[122] and such interpretation is entirely reason-

**118.** *LaScola v. US Sprint Communications,* 946 F.2d 559, 565 (7th Cir.1991).

**119.** *Purgess v. Sharrock,* 33 F.3d 134, 143 (2nd Cir.1994).

**120.** *Walker v. Sheldon,* 10 N.Y.2d 401, 406, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961).

**121.** TR 1078.

**122.** TR 1064–1065.

able. Therefore, the defendants did not sustain their burden of proving that the plaintiffs breached the 1981 contract.

■ Even if the defendants had proved their counterclaim for breach of contract, the defendants failed to prove any damages resulting from the plaintiffs' conduct. The defendants did put forth a request for restitution of the payments made to the plaintiffs under the 1981 consulting contract; however, in making this request, the defendants failed to account for the fact that, by their own admission, the plaintiffs did substantially, if not fully, perform the requirements of the contract. Assuming that a breach occurred which this Court has not found, restitution under these circumstances would be inappropriate and excessive.

■ The defendants also request an award of attorney's fees. Although a court has the power to award attorney's fees where an opposing party has conducted litigation in bad faith or for improper reasons, such an award is not justified here.[123] This Court finds that the plaintiffs and their attorneys conducted this litigation vigorously and properly and in total good faith, and certainly based upon reasonable inquiries. Simply because a party is successful in the end does not imply that the opposing party's conduct was not in good faith.

■ The defendants filed a motion to strike Winfield's testimony claiming that they had been denied the opportunity to cross-examine him in relation to the additional claims made in the Complaint. It has long been regarded that the opportunity to cross-examine is an essential safeguard of the credibility, accuracy and completeness of testimony. However, except in criminal cases, in the event of death of a person who has previously testified there seems no adequate reason for excluding the prior testimony.[124] Where the inability to cross-examine is not attributable to any fault of the opposing party, but solely due to the death of the witness, striking out all prior testimony would be unwarranted.[125] Any preclusion would have to be limited to subject matter not covered by the cross-examination performed.[126] This Court finds that the defendants made substantial use of their opportunity to cross-examine Winfield prior to his death and have failed to satisfy this Court that any prejudice will be suffered if Winfield's testimony is not stricken. The motion to strike will be denied on the merits.

The remaining counterclaims by the defendants for a declaratory judgment regarding the validity of The Patent and inventorship of the same are rendered moot by the findings and conclusions in this case.

After reviewing all the evidence presented and considering the arguments put forth, it is hereby **ORDERED** that the defendants' motion to strike Winfield's testimony is denied and further it is hereby **FOUND AND CONCLUDED** that Winfield was not a joint inventor, that the defendants did not violate the best mode requirement, that the defendants did not misappropriate a trade secret from the plaintiffs, that the plaintiffs' fraud claim based on the 1977 contract is time barred, that the plaintiffs failed to prove fraud otherwise, that the plaintiffs did prove that the defendants had breached the terms of the 1977 contract but did not prove any damages resultant therefrom, that the defendants were not unjustly enriched, that the defendants failed to prove their counterclaims and that neither party is awarded attorney's fees and **ORDERED** that the defendants may have a Judgment of dismissal and for their costs pursuant to FRCvP 54(d)(1), if any.

---

123. *Mar Oil, S.A. v. Morrissey,* 982 F.2d 830, 844 (2nd Cir.1993).

124. 1 John W. Strong *et al., McCormick on Evidence* (1992), § 19.

125. *Wigmore on Evidence* (Chadbourn revision, 1974), § 1390.

126. C.J.S. Witnesses (1957 and 1995 supplement), § 373.