Charles E. GUNTER, Appellant,

v.

Ralph M. STREAM, Appellee.

Appeal No. 77–627.

United States Court of Customs and Patent Appeals.

April 6, 1978.

78

John E. Curley, Pittsburgh, Pa., attorney of record, for appellant.

Vincent L. Barker, Jr., Barker, Emch, Schaffer & Todd Co., L.P.A., Toledo, Ohio, attorneys of record, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

BALDWIN, Judge.

This is an appeal from a decision of the Patent and Trademark Office Board of Patent Interferences (board) which awarded priority as to two counts of an interference to junior party, Stream. We affirm.

On August 11, 1975, an interference was declared between Gunter's application entitled "Heat Pipes for Fin Coolers," serial No. 507,314, filed on September 19, 1974, and Stream's application entitled "Method and Apparatus for Controlling the Viscosity of Glass Streams," serial No. 511,541, filed on October 3, 1974. The two counts of the interference correspond to claims 6 and 8 of Gunter's application and claims 28 and 29 of Stream's application.

The subject matter of the interference is a method and apparatus for employing heat pipe fins for cooling glass fibers as they are drawn through orifices of a glass fiber forming machine. Counts 1 and 2 define the subject matter:

1. A fiber glass bushing unit comprising in combination a container for the reception of molten glass, a plurality of orifices on the bottom of said container arranged in parallel rows, a plurality of plate-like fin members positioned between the rows of orifices by but below and out of contact with said container, said plate-like fins being mounted at one end in a header member, means to pass the fluid coolant through said header member, each of said plate members having a wick material affixed to the interior surfaces of said plate member and having a central cavity located therein, a vaporizable liquid on said wick capable of being vaporized from the surface of said wick and recondensed on said wick during operation.

2. A method of cooling glass fibers being drawn from a molten glass source from a plurality of glass orifices located on the bottom of said glass source, removing heat from said fibers by positioning a plurality of plate-like heat exchange members between said fibers to thereby absorb the radiant heat from said fibers on the surface of said plate-like members continuously, maintaining the surface of the plate-like members receptive to heat absorption by vaporizing a volatile fluid on the interior surface of said plate-like members continuously

from the surface of a wick contained therein and removing heat continuously from said plate-like members by indirect heat exchange with the mounting means for said plate-like members to thereby condense said volatile fluid in said plate-like members and thereby return it to the wick for further vaporization.

Gunter took no testimony and is restricted to his filing date of September 19, 1974, as the date of conception and constructive reduction to practice. Stream, an employee of Owens-Corning Fiberglas Corporation (OCF), assignee of his application, submitted testimony and documentary evidence to support a date of conception and reduction to practice prior to Gunter's filing date. Stream himself testified that, in August of 1970, he read an article on heat pipe technology published in the August 6, 1970, edition of *Machine Design*, which was admitted into evidence as Stream Exhibit 2. According to the testimony, Stream had a conversation, on or before August 27, 1970, with his supervisor, Mr. Hellmut I. Glaser,[1] in which he told Glaser of his idea to apply heat pipe technology to glass fiber making. Glaser corroborated Stream's testimony about their conversation and also testified that he reported on Stream's idea to Mr. Steven R. Gustafson, then patent attorney for OCF. Subsequent to this conversation with Glaser, Gustafson reduced Glaser's report to writing on September 2, 1970. Glaser testified that the contents of the Gustafson memo, which was admitted into evidence as Stream Exhibit 3, was an accurate summary of his report.

To support his reduction to practice of the invention, Stream produced employees of OCF who testified about contracting with Hughes Aircraft Company for construction of prototype fin shields which were eventually completed and shipped to OCF on November 11, 1973. Tests were performed on the prototypes by OCF at its Huntingdon Plant on April 17 and 18, 1974.

In its opinion, the board defined conception as a disclosure of an invention which enables one skilled in the art to reduce the invention to a practical form without "exercise of the inventive faculty." The board was persuaded by the evidence presented by Stream on the question of conception. It found that appellee conceived the invention on August 27, 1970, when he understood it to the extent that he was able to disclose it to another who in turn understood the invention.

## OPINION

■ On the question of reduction to practice, the board found that the Hughes' prototype, successfully tested by OCF, embodied every essential element of the counts. The tests conducted on April 17 and 18, 1974, were proof of an actual reduction to practice, which is attributable to Stream. We agree with the board's finding on this issue, and we are not persuaded by appellant's argument that the reduction to practice does not inure to the benefit of Stream, since he took no part in this phase. Stream can prevail if he proves an earlier date of conception by a preponderance of the evidence. *Land v. Dreyer*, 155 F.2d 383, 33 CCPA 1108 (1946); *Townsend v. Smith*, 36 F.2d 292, 17 CCPA 647 (1929). The issue before the court, then, is whether Stream proved, as junior party, by a preponderance of evidence that he had conception on or about August 27, 1970.

Gunter argues that Stream never had conception but only expressed an invitation to experiment with heat pipes in glass fiber forming machines. Stream is required, Gunter argues, to have conceived not only

---

1. Glaser is an engineer who had been with OCF since 1956 as a specialist in glass fiber formation. In 1970, he became a manager of the Process Technology Department.

the invention, but the means to accomplish the invention. The conception was not completed by Stream because extensive research by Hughes Aircraft was necessary to achieve satisfactory performance of the invention. Gunter further argues that while Hughes Aircraft was working on the prototype, it suggested to OCF the use of cooling blocks in the construction of the prototypes. This, he argues, militates against Stream being in possession of a conception which included use of a "header member" which is recited in the counts. It is contended also that Stream had no connection with the invention from August of 1970 until September 27, 1974, when he reviewed and signed the application disclosing his invention and that there is no evidence on record to indicate that Stream was ever informed of the progress of Hughes Aircraft or of the tests of OCF.

 The board correctly cited the definition for conception initially stated in *Mergenthaler v. Scudder*, 11 App.D.C. 264, 276, 1897 C.D. 724, 731 (1897):

> The conception of the invention consists in the complete performance of the mental part of the inventive act. All that remains to be accomplished, in order to perfect the act or instrument, belongs to the department of construction, not invention. It is therefore the formation, in the mind of the inventor, *of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice,* that constitutes an available conception, within the meaning of the patent law.

We adopted this definition in *Townsend v. Smith*, supra. Reviewing the evidence supporting conception, we conclude that the conception of using heat pipe technology in glass fiber forming, as described in the counts, occurred on or about August 27, 1970. We hold, therefore, that Stream established by a preponderance of the evidence that he conceived the invention on or about that date. Having already shown that there was reduction to practice by the assignee, Stream's conception completes the showing necessary to award priority.

The facts show that on or about August 6, 1970, Stream read and understood the article on heat pipe technology. With his working knowledge of glass fiber forming and his understanding of basic heat pipe technology described in the article, Stream conceived the invention, applying heat pipe technology to glass fiber forming. The Gustafson memo is the only documentary evidence which corroborates the conception.[2] It states, in pertinent part:

> On August 27, 1970, Mr. Hellmut Glaser disclosed to Michael Mitcham and the writer that commercially available "heat pipes" might be advantageous substitutes for our present fin shields.
>
> The heat pipes cool the surrounding area through the vaporization of fluid contained inside the pipe. One such heat pipe is made by Electron Dynamics[3] and is very similar in size and shape to a single fin shield. In operation, one end of the heat pipe is soldered or welded to a cooling manifold.
>
> According to Mr. Glaser the original suggestion for this incorporation of heat pipes was made by Ralph Stream.

The memo was the culmination of two conversations both involving Glaser, who corroborated Stream's testimony about the first conversation:

> Q. What do you recall about that conversation? A. Well, Ralph Stream came to my office with an article out of a trade journal, trade magazine on heat pipes, and disclosed to me that this might be application [sic] to be used on finshields; certainly might be something we could use there, that application.
>
> Q. If I hand you a copy of Stream Exhibit 2, do you recall if that's the arti-

---

2. Both Gustafson and Glaser testified about the memo. Gustafson identified the document, while Glaser, on direct examination, testified that he understood the memo to be an accurate reflection of his conversation with Gustafson on August 27, 1970.

3. Electron Dynamics is a division of Hughes Aircraft Company.

cle you just mentioned, that Ralph Stream came to you with? A. Yes.

\* \* \* \* \* \*

Q. Okay. Do you recall any of the details of the conversation between you and Ralph Stream which you just referred to? A. I think it's difficult to recall details about that. He brought the article into my office.

Q. Sure. A. He brought the article into my office and I recall that we shortly discussed the concept of heat pipes, and that because of the advantages such a device offers, we should seek to utilize it in the cooling of forming cones, possibly as a substitute for finshields.

Q. Based on your conversation, or at the time of the conversation with Mr. Stream, did you understand in general what a heat pipe is? A. I think the article pretty much describes it, yes.

Q. Following your conversation with Mr. Stream, you felt that you understood the concept of utilizing heat pipe technology in the finshield environment? A. Yes. We were very intrigued by it, by that concept.

Glaser testified also to the second conversation with Gustafson:

Q. Let's refer back to Stream Exhibit 3, and this is written by Mr. Gustafson, so you can't really testify as to the truth of what it says, but you could tell me if, does this refresh your memory as to whether or not it is an accurate reflection of your conversation with Mr. Stream? A. Yes.

Q. Okay. And do you have any reason to believe that your conversation with Mr. Gustafson was after August 27, 1970? A. All I—it's difficult to remember dates, exact dates. We discussed, we, with Steve Gustafson, Ralph Stream's ideas, within a couple of days after Ralph Stream brought it in to me, because Steve came down at that time almost weekly or biweekly to—

Q. Okay. And Mr. Gustafson in Stream Exhibit 3 says in the third paragraph, "According to Mr. Glaser, the original suggestion for this incorporation of heat pipes was made by Ralph Stream." A. Right.

Q. Do you agree with that statement? A. Yes.

With this evidence to support conception of the invention on or about August 27, 1970, the inquiry is directed to the substance of the conception. Did Stream conceive, at that point in time, all the essential elements of the counts? To answer this inquiry we compare the counts to the description in the Gustafson memo. The counts reproduced in their entirety, above, include an apparatus count and a method count. The apparatus count describes the fiber glass bushing unit as primarily a plate-like fin member, which has a central cavity for vaporization of a fluid coolant which travels through a wick, in combination with a header member, which possesses a means to pass the fluid coolant. The method count describes the cooling process as vaporization of fluid coolant and indirect heat exchange with a header member (cooling block).

The Gustafson memo describes the invention as a heat pipe, which replaces a standard fin shield, connected to a "cooling manifold." This combination corresponds to the description of the apparatus in count 1. The plate-like fin member corresponds to the heat pipe, both cool through the "vaporization of fluid inside the pipe." The header member corresponds to the "cooling manifold," as both secure one or a plurality of heat pipes or fin members, and both provide a means for indirect heat exchange. Thus, the Gustafson memo describes the process of cooling as set forth in method count 2.

Gunter's argument that, in July of 1972, Hughes Aircraft suggested the cooling block and that, therefore, Stream was not in possession of a complete conception in August of 1970, is fully met by the suggestion of a "cooling manifold" in the Gustafson memo. The comparison of the counts with the description of the Stream invention in the Gustafson memo, we conclude, shows clearly that Stream conceived the invention with all essential elements of the counts at least by August 27, 1970.

*Motion to Tax Costs*

Appellant requests the court to tax appellee for the cost of seventy-one pages of a ninety-three page addition to the printed transcript. The ninety-three page addition supplemented testimony of six of appellant's witnesses. Appellee, in opposition to the motion, argues that this testimony is relevant to the issues of conception and reduction to practice raised by appellant in his notice of appeal.

For purposes of allocating printing costs, appellant is required to bear the printing costs for that material necessary for the court to decide the issues he raised on appeal. *Meitzner v. Mindick*, 549 F.2d 775 (CCPA 1977), *cert. denied*, 434 U.S. 854, 98 S.Ct. 171, 54 L.Ed.2d 124 (1977); *Myers v. Feigelman*, 455 F.2d 596, 59 CCPA 834 (1972). We conclude, after examining the testimony in question, that the material was necessary for consideration of the issues on appeal. Appellant's motion is accordingly denied.

Having reached the above conclusion with regard to conception and reduction to practice, we *affirm* the decision below which awards priority to junior party, Stream.

*AFFIRMED.*